IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Village of Tinley Park, Illinois, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. |
| | ) | |
| v. | ) | |
| | ) | |
| Amy Connolly, | ) | |
| | ) | |
| Defendant. | ) | |

## **COMPLAINT**

The Village of Tinley Park, Illinois, by its undersigned attorneys, states its complaint against Amy Connolly for breaching her fiduciary duties to the Village of Tinley Park, Illinois as follows:

### **The Parties**

1. The Village of Tinley Park, Illinois (the "Village") is a municipal corporation with its principal place of business located in Cook County and Will County, Illinois.

2. Amy Connolly ("Connolly") is an individual who resides in and is a resident of Racine, Wisconsin.

### **Jurisdiction and Venue**

3. This Court has diversity jurisdiction over the parties pursuant to 28 U.S.C. §1332(a). The Village and Connolly are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

4. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

**Facts**

*Connolly begins her employment with the Village*

5. In September of 2007, Connolly began her employment with the Village as Director of Planning.

6. The Director of Planning is a highly responsible administrative/management position involving technical work in planning and directing all operations of the planning areas. Under administrative direction, work performed is of considerable difficulty and is reviewed as to progress and conformance to established standards.

*The Legacy Code is adopted by the Village*

7. In 2009, the Village worked with an independent outside consultant at a significant cost to establish the Legacy Plan, a 98-page document meant to create an "integrated downtown master plan for Tinley Park" and "a walkable downtown." In 2011, after two years of planning by the Village, the Legacy Plan was implemented through the passage of the Legacy Code. The Legacy Code implemented many of the principles and goals of the original Legacy Plan.

8. One of the purposes of the Legacy Code was to create corridors of commercial real estate leading to the downtown business district. It accomplished this purpose by including a requirement that all new real estate developments along those corridors contain street level commercial space (hereinafter "Street Level Commercial Requirement").

*Connolly struggles to bring in development*

9. During her tenure as Director of Planning, Connolly struggled to bring development into the downtown corridor. In fact, during her tenure as Director of Planning, there was very little development in the area of the Village covered by the Legacy Code.

10. Upon information and belief, in order to show that she could perform her job and to help secure her continued employment with the Village, Connolly became desperate to secure large developments in the area of the Village covered by the Legacy Code.

11. As such, Connolly decided that she would do whatever was necessary to secure such a development, including breaching her fiduciary duties to the Village by, among other things, making numerous intentional misrepresentations to Village Trustees and employees and third parties, including misrepresentations with regard to a development called The Reserve.

*Connolly makes misrepresentations to the Village when she schemes with a housing development company to circumvent Village zoning requirements*

12. In March 2015, Buckeye Community Hope Foundation and Buckeye Community Sixty Nine LP (jointly, "Buckeye") contacted the Village and inquired about a potential development of the northeast corner of 183rd and Oak Park Avenue.

13. The Buckeye development was called The Reserve.

14. The Reserve was proposed for the area of the Village covered by the Legacy Code where the Street Level Commercial Requirement was applicable.

15. However, no plans for The Reserve ever included street level commercial space. As such, The Reserve did not at any time comply with the Street Level Commercial Requirement.

16. Connolly knew that The Reserve did not meet the Street Level Commercial Requirement.

3

17. In her desire to ensure The Reserve was built, Connolly intentionally ignored and actively concealed this deficiency.

18. In summary, Connolly breached her fiduciary duties to the Village by making the following intentional misrepresentations:

a. Connolly represented to the Village that The Reserve met all Village zoning code requirements. Connolly knew this was false because Connolly knew that The Reserve did not meet the Street Level Commercial Requirement in place at the time.

b. Connolly represented to the Illinois Housing Development Authority that The Reserve met zoning code and land use requirements for the Village. Connolly knew this was false because Connolly knew that The Reserve did not meet the Street Level Commercial Requirement in place at the time.

c. On August 6, 2015, the Village Plan Commission had one of its regular meetings. For that meeting, Connolly prepared a motion to review and consider amending a section of the Legacy Code, including amendments pertaining to use restrictions (package liquor, tobacco, etc.), amendments to fix scrivener's errors in the Legacy Code, and an amendment which changed the Street Level Commercial Requirement in the Legacy Code to a street level commercial *permitted* obligation (hereinafter, "Street Level Commercial Permitted Amendment") (collectively, all of the proposed amendments are the "Text Amendments"). Connolly purposefully never told the Plan Commissioners the significance of the Street Level Commercial Permitted Amendment. In fact, she intentionally concealed and/or misrepresented the repercussions of adopting the Street Level Commercial Permitted Amendment by describing it as minor and that it would help development downtown. She purposefully never told the Plan Commissioners that by passing the Street Level Commercial Permitted Amendment, in effect, the Plan Commission would be getting rid of the requirement of commercial development in the downtown corridor for any new developments.

d. On October 6, 2015, the Village Board approved the Text Amendments, including the Street Level Commercial Permitted Amendment. However, as part of the discussion by the Village Board regarding the Text Amendments, the only discussion was with regard to the use amendments (i.e. the tobacco-based limitations). Connolly intentionally failed to explain to the Board of Trustees the significance of the Text Amendments. In fact, when discussing the Text Amendments to Trustee Vandenberg, the trustee liaison to the Plan Commission who was to introduce the Text Amendments to the other trustees, Connolly concealed the Street Level Commercial Permitted Amendment, and explained to Vandenberg that the only significant amendment within the Text Amendments dealt with tobacco-based restrictions in the downtown corridor.

4

19. Eventually, Connolly's scheme was discovered and the Plan Commission voted to table the application for The Reserve and sent the application back to the Planning Department for further review.

20. On March 22, 2016 citizens of the Village of Tinley Park filed a lawsuit against the Village, requesting that the court void the Text Amendments.

21. On May 17, 2016 the Village of Tinley Park rescinded the Text Amendments.

22. Subsequent to the Village sending Buckeye's application back to the Planning Department, Buckeye filed a federal lawsuit against the Village for, among other claims, discrimination under the Fair Housing Act. Thereafter, the United States also filed a federal lawsuit against the Village for discrimination under the Fair Housing Act.

23. Had Connolly not schemed to change the Legacy Code without the Village's knowledge, the Village would not have been sued by Buckeye or the United States.

24. Had Connolly not schemed to change the Legacy Code, she could have devoted her time to attracting developments to the Village which complied with the Legacy Code, or worked with the Village to develop amendments to the Legacy Code that could help development while not destroying one of the major intentions of the Legacy Plan, namely commercial development.

*Amy Connolly resigns to take a job in Racine, Wisconsin*

25. On February 17, 2016, the Village placed Connolly on leave, with pay, pending a review of her dealings related to the Text Amendments and her handling of the application for The Reserve.

26. On or about May 6, 2016, Connolly resigned from her position as the Village's Director of Planning.

27. On May 9, 2016, Connolly began her new job as the City of Racine, Wisconsin's Development Director.

*Connolly breached her fiduciary duties to the Village*

28. As a management-level employee, Connolly was a fiduciary of the Village.

29. As a fiduciary of the Village, Connolly owed the Village duties of care, loyalty and good faith.

30. In addition, Connolly also knew about the Rules of Conduct/Code of Ethics contained in the Village Personnel Manual. Connolly signed documents on multiple occasions acknowledging her receipt of the Personnel Manual.

31. Section 4.1 Rules of Conduct/Code of Ethics of the Personnel Manual states, in relevant part that "Employees of the Village must adhere to the following standards…[including]…[b]e[ing] honest and trustworthy in all they say and write."

32. Notwithstanding Connolly's duties and responsibilities as a management-level employee and fiduciary of the Village, Connolly engaged in a pattern of willful, deliberate conduct that was adverse to the Village's interests, violated Village policies, procedures and Rules of Conduct/Code of Ethics, and was intended solely to benefit Connolly's self-interest.

33. Specifically, Connolly acted dishonestly and made numerous misrepresentations to the Village and its employees regarding changes to the Legacy Code.

34. Connolly engaged in this misconduct for her own personal gain and to the detriment of the Village in order to protect her job and promote her self-interest.

35. During Connolly's employment with the Village, the Village paid Connolly's salary and benefits in consideration for Connolly's faithful and loyal performance.

36. Without the Village's knowledge, from at least April 2015 until her voluntary resignation on May 6, 2016, Connolly was in fact an unfaithful, disloyal employee.

37. As a result of Connolly's misconduct, the Village has been damaged in the amount of the total compensation that the Village paid to or on behalf of Connolly from at least April 2015 until her voluntarily resignation on May 6, 2016.

38. As a result of Connolly's misconduct, the Village has been damaged in the amount it was forced to expend to defend against and then settle a federal lawsuit filed by Buckeye against the Village, and defend against a lawsuit filed against it by the United States.

WHEREFORE, the Village requests that this Court enter judgment in its favor and against Connolly in an amount in excess of $75,000 plus punitive damages sufficient to punish Connolly for her wrongful conduct and to deter others from such conduct, to grant the Village its attorneys' fees and costs and to grant the Village such further relief this Court deems just.

**PLAINTIFF DEMANDS TRIAL BY JURY**

       Respectfully submitted,

       VILLAGE OF TINLEY PARK, ILLINOIS

       By: /s/ Alastar S. McGrath
       One of its Attorneys

Alastar S. McGrath
Jerome R. Weitzel
Larry J. Lipka
KOZACKY WEITZEL MCGRATH, P.C.
55 W. Monroe St., Ste. 2400
Chicago, Illinois 60603
(312) 696-0900